JIMMIE JOE STALEY, APPELLEE AND CROSS-APPELLANT, V.
CITY OF OMAHA, A MUNICIPAL CORPORATION,
APPELLANT AND CROSS-APPELLEE.

713 N.W.2d 457

Filed May 5, 2006. No. S-04-1240.

544

Thomas O. Mumgaard, Deputy Omaha City Attorney, for appellant.

Edward F. Fogarty, of Fogarty, Lund & Gross, and G. Anne Evans for appellee.

William F. Austin, of Erickson & Sederstrom, P.C., for amicus curiae League of Nebraska Municipalities.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

STEPHAN, J.

Jimmie Joe Staley sustained serious injuries when a vehicle in which he was a passenger was struck by a vehicle operated by Michael Barnes, who was the subject of a vehicular pursuit by Omaha police. Staley brought this action against the City of Omaha (the City) under the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. §§ 13-901 to 13-926 (Reissue 1997 & Supp. 1999), alleging negligence on the part of the officer conducting the pursuit and strict liability under § 13-911. Following a bench trial, the district court for Douglas County found that the officer was not negligent but held that the City was strictly liable based on a finding that Staley's injuries and damages were proximately caused by the officer's actions during the vehicular pursuit. The court determined that Staley sustained damages in the amount of $2,933,402. The court rejected Staley's argument that the $1 million cap on damages recoverable under the Political Subdivisions Tort Claims Act imposed by § 13-926(1) was unconstitutional and entered judgment for Staley in that amount. The City appeals, contending that the court erred in its determination of proximate cause. Staley cross-appeals from the district court's determination that the statutory cap on damages was constitutional. We affirm the judgment of the district court.

## I. BACKGROUND

In the early morning hours of April 14, 2000, Barnes and four companions left an Omaha nightclub and proceeded north on 72d Street in a 1982 Buick, with Barnes at the wheel. After weaving through construction areas on 72d Street, Barnes brought the vehicle to an abrupt, sliding stop when he became aware of a red traffic signal at the intersection of 72d and Dodge Streets. Omaha Police Sgt. John Sears observed Barnes' erratic driving from his police cruiser, where Sears was also stopped at the same intersection, but in a southbound direction on 72d Street. When the light turned green and Barnes proceeded through the intersection, Sears made a U-turn and followed Barnes as he proceeded north on 72d Street and then turned east onto Cass Street. While

proceeding east on Cass Street between 72d and 69th Streets, Sears activated his cruiser's overhead red flashing lights in an attempt to signal Barnes to pull over. Barnes did not comply, but instead, accelerated and turned north onto 69th Street, at which point, Sears began pursuit and radioed for assistance from a police helicopter. Initially, and at several times during the pursuit, Sears attempted to activate the siren of his police cruiser, but he was never able to do so because a control knob was missing. Sears continued to pursue Barnes north on 69th Street at speeds ranging from 50 to 70 miles per hour.

As Barnes drove through the intersection of 69th and Blondo Streets, Sears was one to three blocks behind him. Sears observed that Barnes narrowly avoided colliding with a vehicle as Barnes drove through the intersection. Sears decided to slow his cruiser and terminate the pursuit at approximately 69th and Blondo Streets, where he turned off his cruiser's flashing lights. Sears lost sight of the Buick when it reached 69th and Lake Streets. Proceeding in "search mode," Sears turned right onto Lake Street and then turned left onto 68th Street with his cruiser's flashing lights turned off.

After turning right at 69th and Lake Streets, Barnes proceeded one block east and then turned south onto 68th Street. Barnes still saw the cruiser's flashing lights when he turned at Lake Street, and one of his passengers last saw the cruiser's flashing lights reflecting off nearby houses when Barnes was proceeding south between Lake and Grant Streets on 68th Street. After proceeding south on 68th Street for one block, Barnes turned left onto Grant Street, still believing the police were pursuing him and attempting to avoid police contact. Barnes proceeded east down a steep hill on Grant Street, reaching speeds exceeding 65 miles per hour. He did not stop for any of the stop signs between 68th and 65th Streets on Grant Street. As he proceeded east on Grant Street, Barnes' passengers told him they could no longer see the police cruiser. Within approximately 30 seconds of the last sighting of the cruiser's flashing lights, Barnes ran the stop sign at the intersection of 65th and Grant Streets and collided with a northbound pickup operated by Joshua McGrath, in which pickup Staley was a passenger. The collision tore the pickup in half, and the front section was propelled into a tree and exploded.

Staley was trapped in the vehicle, and both he and McGrath sustained severe burn injuries.

After complying with the notice provisions of the Political Subdivisions Tort Claims Act, Staley and McGrath filed separate actions against the City in the district court for Douglas County. The actions were consolidated for trial and discovery. Following trial, the district court made written findings of fact in which it determined that the vehicular pursuit was the proximate cause of the collision and resulting injuries to Staley and McGrath. In making these findings, the court rejected the City's argument that Barnes should have known that the pursuit had ended before he turned east onto Grant Street.

The district court found that Staley received third-degree burns over 70 percent of his body. He was hospitalized from April 14 to September 14, 2000, during which time he underwent painful debridement procedures. Following his hospitalization, Staley received therapy 5 days a week for 1 year. He incurred $575,378.06 in medical bills, and his estimated future medical bills are $25,024. He has permanent scarring over 70 percent of his body, limited mobility, and significant lung damage. His physician rated his injuries as a 53-percent impairment of the body as a whole. Staley is unable to perform manual labor and is unemployable unless he obtains further education. His lost earnings and lost earning capacity to age 65 were estimated at $433,000. After determining compensatory damages in the amount of $2,933,402 and reducing the award to $1 million in order to comply with the cap on damages imposed by § 13-926(1), the district court determined that the statutory cap on damages was constitutional for the reasons set forth in *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003).

## II. ASSIGNMENTS OF ERROR

The City assigns, restated, that the district court erred in concluding that the vehicular pursuit was the proximate cause of Staley's injury and damages under the provisions of § 13-911. In his cross-appeal, Staley contends that the district court erred in upholding the constitutionality of the cap on damages imposed by § 13-926(1), as applied to him.

## III. STANDARD OF REVIEW

In actions brought pursuant to the Political Subdivisions Tort Claims Act, the findings of a trial court will not be disturbed on appeal unless they are clearly wrong. *Tadros v. City of Omaha*, 269 Neb. 528, 694 N.W.2d 180 (2005); *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 267 Neb. 958, 679 N.W.2d 198 (2004). Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the trial court. *Ptak v. Swanson, ante* p. 57, 709 N.W.2d 337 (2006); *Polikov v. Neth*, 270 Neb. 29, 699 N.W.2d 802 (2005).

## IV. ANALYSIS

### 1. PROXIMATE CAUSE

The district court held the City liable to Staley under § 13-911, which provides in pertinent part:

> (1) In case of death, injury, or property damage to any innocent third party proximately caused by the action of a law enforcement officer employed by a political subdivision during vehicular pursuit, damages shall be paid to such third party by the political subdivision employing the officer.
>
> . . . .
>
> (5) For purposes of this section, vehicular pursuit means an active attempt by a law enforcement officer operating a motor vehicle to apprehend one or more occupants of another motor vehicle, when the driver of the fleeing vehicle is or should be aware of such attempt and is resisting apprehension by maintaining or increasing his or her speed, ignoring the officer, or attempting to elude the officer while driving at speeds in excess of those reasonable and proper under the conditions.

This statute creates strict liability on the part of a political subdivision when (1) a claimant suffers death, injury, or property damage; (2) such death, injury, or property damage is proximately caused by the actions of a pursuing law enforcement officer employed by the political subdivision; and (3) the claimant is an innocent third party. *Stewart v. City of Omaha*, 242 Neb. 240, 494 N.W.2d 130 (1993), *disapproved on other grounds, Henery v. City*

*of Omaha*, 263 Neb. 700, 641 N.W.2d 644 (2002). The City stipulated that Sears was engaged in a vehicular pursuit within the meaning of § 13-911 until he reached 69th and Blondo Streets, but the parties dispute whether the pursuit extended beyond that point. The parties also stipulated that both Staley and McGrath were innocent third parties within the meaning of the statute.

The City argues that the pursuit could not have been the proximate cause of the collision and Staley's injuries because it had ended almost one-half mile before the collision occurred, the fleeing driver should have known that the pursuit had ended, and the police officer would have reasonably concluded that the flight and any danger to innocent third parties had ended. This argument is based upon Sears' testimony regarding the point at which he terminated the pursuit and the opinions of Geoffrey Alpert, a professor of criminology who testified as an expert witness for the City. Alpert testified that based upon interviews which he conducted with motorists who had fled from police, the public is still at risk within a two- to four-block "zone of danger" between the time an officer discontinues a pursuit by turning off lights and sirens and the time a fleeing driver feels safe enough to adjust his or her driving. Alpert testified that the "zone of danger" is 2.2 blocks in an urban area, 2.3 miles in rural areas, and 2.5 miles on freeways. Alpert opined that because Barnes' reckless driving continued for one-half mile, or approximately six blocks, after Sears turned off his cruiser's lights in an urban area, Barnes' behavior fell outside of the norm, and thus, the danger to the public was unforeseeable. Based upon Alpert's testimony, the City argues that the only conclusion supported by the evidence is that the pursuit could not have been the proximate cause of Staley's injuries because Barnes had proceeded more than four blocks from the point where Sears had terminated the pursuit at the time of the accident.

█ Determining the weight that should be given expert testimony is uniquely the province of the fact finder. *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 267 Neb. 958, 679 N.W.2d 198 (2004); *Hawkins v. City of Omaha*, 261 Neb. 943, 627 N.W.2d 118 (2001). As the finder of fact, the district court had the authority to determine what weight, if any, it would give to Alpert's testimony. See *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., supra.* While it is apparent that the trial judge gave little weight to Alpert's

opinions, he was free to do so. We do not second-guess that decision, because in a bench trial under the Political Subdivisions Tort Claims Act, it is not the purview of an appellate court to reweigh the evidence. *Id.*

■ Moreover, we reject the City's argument that the issue of proximate cause in the context of a vehicular pursuit case can be reduced to a rigid formula involving time and distance. The question of proximate cause, in the face of conflicting evidence, is ordinarily one for the trier of fact, and the court's determination will not be set aside unless clearly wrong. *Meyer v. State,* 264 Neb. 545, 650 N.W.2d 459 (2002). In *Meyer,* we held that the provisions of the State Tort Claims Act, see §§ 81-8,209 to 81-8,235 (Reissue 2003), which imposed strict liability for injuries to innocent third parties caused by a vehicular pursuit "require[d] that the actions of a law enforcement officer during a vehicular pursuit be merely a proximate cause of the damage, and not the sole proximate cause." *Meyer v. State,* 264 Neb. at 550, 650 N.W.2d at 463. See § 81-8,215.01. We reach the same conclusion here, inasmuch as the pertinent language of § 13-911 is the same as the provisions of the State Tort Claims Act considered in *Meyer.*

■ A proximate cause is a cause that (1) produces a result in a natural and continuous sequence and (2) without which the result would not have occurred. *Meyer v. State, supra; Brandon v. County of Richardson,* 261 Neb. 636, 624 N.W.2d 604 (2001). The test of causation is not that the particular injury could be anticipated but whether after the occurrence, the injury appears to be the reasonable and probable consequence of the acts or omissions. *Meyer v. State, supra; Woollen v. State,* 256 Neb. 865, 593 N.W.2d 729 (1999).

In applying these well-established principles to the evidence in this case, the district judge properly took into consideration the actions and thought processes of both the pursuing officer, Sears, and the fleeing motorist, Barnes. The statutory definition of "vehicular pursuit" refers to an officer's "active attempt . . . to apprehend one or more occupants of another motor vehicle, when the driver of the fleeing vehicle is or should be aware of such attempt and is resisting apprehension." § 13-911(5). Based on this definition, we held in *Meyer* that for the pursuit to have

been a proximate cause of the accident, the pursuit must have caused the motorist to resist apprehension by maintaining or increasing speed, or by attempting to elude the pursuing officer at unreasonable speeds. In determining that the trial court was clearly wrong in concluding that the fleeing motorist was motivated by a psychotic episode, rather than by the pursuit, we noted the undisputed fact that the motorist was aware of the pursuit and that at certain times, his actions while driving were "a result of his attempts to evade his pursuer." *Meyer v. State*, 264 Neb. at 555, 650 N.W.2d at 466.

■Although this case differs from *Meyer* in that Sears had terminated the pursuit prior to the accident in which Staley was injured, this fact does not automatically insulate the City from strict liability for injuries to an innocent third party. A law enforcement officer's decision and action to terminate a vehicular pursuit do not instantaneously eliminate the danger to innocent third parties contemplated in § 13-911. That danger continues until the motorist reasonably perceives that the pursuit has ended and has an opportunity to discontinue the hazardous, evasive driving behaviors contemplated in the statute. Thus, whether an injury to an innocent third party is "proximately caused by the action of a law enforcement officer . . . during vehicular pursuit" is a question of fact which must necessarily be determined on a case-by-case basis. See § 13-911(1).

In this case, there is ample evidence that the pursuit set in motion a series of events that resulted in Staley's injuries. See *Meyer v. State*, 264 Neb. 545, 650 N.W.2d 459 (2002), citing *Kopecky v. National Farms, Inc.*, 244 Neb. 846, 510 N.W.2d 41 (1994). The pursuit occurred during hours of darkness in a residential neighborhood. Because Sears was never able to activate his cruiser's siren, there was no audible signal that he had decided to terminate the pursuit. Barnes testified that he made hard right turns at 69th and Lake Streets and a block later at 68th and Lake Streets in an effort to evade the police pursuit. One of the passengers in Barnes' vehicle testified that she last saw the flashing lights of the cruiser reflecting off nearby houses as Barnes was proceeding on Lake Street between 69th and 68th Streets, approximately one-half mile from the scene of the accident. Barnes traveled this distance in approximately 30 seconds. After proceeding

south on 68th Street for one block, Barnes turned left onto Grant Street, still believing that he was being pursued. He drove east at a high rate of speed through several stop signs before colliding with the McGrath vehicle at 65th and Grant Streets. Barnes testified that he believed he was being pursued and was attempting to evade police from 69th and Cass Streets to 65th and Grant Streets. Under the totality of the circumstances, we cannot say that this belief was unreasonable. Accordingly, we conclude that the district court did not err in determining that the injuries to Staley were proximately caused by the actions taken by Sears during a vehicular pursuit.

### 2. CONSTITUTIONALITY OF DAMAGE CAP

The Political Subdivisions Tort Claims Act limits damages for which a political subdivision may be held liable to "[o]ne million dollars for any person for any number of claims arising out of a single occurrence." § 13-926(1). Pursuant to this statute, the district court entered judgment for Staley in the amount of $1 million, despite the fact that it determined his total damages to be $2,933,402. The district court rejected Staley's contention that the statutory damage cap was unconstitutional. In his cross-appeal, Staley assigns error with respect to this determination, claiming that the damage cap is unconstitutional under several alternative theories.

 We are guided by familiar general principles applicable to claims that a statute is unconstitutional. Statutes are afforded a presumption of constitutionality, and the unconstitutionality of a statute must be clearly established before it will be declared void. *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003). The Nebraska Legislature is presumed to have acted within its constitutional power despite that, in practice, its laws may result in some inequality. *Id.*

### (a) Equal Protection

 Staley first contends that the statutory cap denies him equal protection in violation of article I, § 3, of the Nebraska Constitution because there is no similar damage cap under the State Tort Claims Act. He contends that the result is unequal treatment of city tort victims as compared to state tort victims and discrimination of catastrophically injured city tort victims. When a

statute is challenged on equal protection grounds, whether under the U.S. or Nebraska Constitution, the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. *In re Interest of Phoenix L.*, 270 Neb. 870, 708 N.W.2d 786 (2006); *Hass v. Neth*, 265 Neb. 321, 657 N.W.2d 11 (2003). If, in distinguishing between classes, the classifications involved in a statute do not create any suspect class or address any fundamental right, the court applies only minimal scrutiny under the equal protection analysis. *Hall v. Progress Pig, Inc.*, 259 Neb. 407, 610 N.W.2d 420 (2000).

■ The classification at issue here is between the State of Nebraska and all political subdivisions of the State of Nebraska. The tort liability of political subdivisions is subject to the statutory cap, whereas the tort liability of the state is not. Because there is no suspect class or fundamental right involved and the interests at issue are economic, we apply the rational basis test to Staley's equal protection challenge. See *Gourley v. Nebraska Methodist Health Sys., supra.* Under this most relaxed and tolerant form of judicial scrutiny of equal protection claims, the Equal Protection Clause is satisfied as long as (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is based may rationally have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. *Id.*; *Pfizer v. Lancaster Cty. Bd. of Equal.*, 260 Neb. 265, 616 N.W.2d 326 (2000).

Staley relies upon three cases which held that statutes granting full or partial immunity for governmental entities were in violation of the Equal Protection Clause. In *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, 596 P.2d 446 (1979), the court held that a statute which gave the state immunity with respect to tort claims involving defects on the Kansas turnpike violated equal protection because the state had no similar immunity with respect to claims involving defects on other state highways. In *Peddycoart v. City of Birmingham*, 354 So. 2d 808 (Ala. 1978) (superseded by statute as stated in *Freeman v. Purvis*, 400 So. 2d 389 (Ala. 1981)), the court applied the rational basis test to strike down a statute which granted tort immunity to the largest

city in the state where other cities enjoyed no such immunity. Similarly, in *Ryszkiewicz v. City of New Britain*, 193 Conn. 589, 479 A.2d 793 (1984), the court found no rational basis for a state statute which capped one city's liability for damages caused by ice and snow on its streets, where the liability of other cities was not similarly capped.

*Flax*, *Peddycoart*, and *Ryszkiewicz* are distinguishable in that they address disparate treatment within a governmental classification. The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003); *Pfizer v. Lancaster Cty. Bd. of Equal.*, *supra*. The Political Subdivisions Tort Claims Act creates a single class of tort-feasors, consisting of all political subdivisions. *Campbell v. City of Lincoln*, 195 Neb. 703, 240 N.W.2d 339 (1976). All members of the class are subject to the same damage cap, and thus, the reasoning of the cases relied upon by Staley is inapposite.

The record reflects that the Political Subdivisions Tort Claims Act was amended in 1985 to include a damage cap because of legislative concern regarding the cost and availability of liability insurance for political subdivisions, and the perceived need of the state to protect the fiscal stability of its political subdivisions. There is no evidence of similar concerns with respect to the state. Because of differences in tax base and available taxing mechanisms, the ability of the State of Nebraska to respond to monetary judgments is quantitatively different from that of a single political subdivision of the state. Courts will not reexamine independently the factual basis on which a legislature justified a statute, nor will a court independently review the wisdom of a statute. Instead, courts inquire whether the legislature reasonably could conceive to be true the facts on which the challenged statute was based. See *Gourley v. Nebraska Methodist Health Care Sys.*, *supra*, and cases cited therein. On the record before us, we conclude that the Legislature had a rational basis for the legislative enactment of a damage cap applicable to political subdivisions which does not apply to the state.

## (b) Substantive Due Process

Alternatively, Staley argues that the statutory cap on damages violates his rights under article I, § 3, of the Nebraska Constitution by depriving him of substantive due process. Substantive due process relates to the content of the statute specifying when a right can be lost or impaired. *In re Adoption of Baby Girl H.*, 262 Neb. 775, 635 N.W.2d 256 (2001). When a fundamental right or suspect classification is not involved in the legislation, the legislative act is a valid exercise of the police power if the act is rationally related to a legitimate state interest. *State v. Champoux*, 252 Neb. 769, 566 N.W.2d 763 (1997). As in our equal protection analysis, we conclude that the challenged cap on damages does not involve a fundamental right or suspect classification and, therefore, apply a rational basis analysis. See *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978) (holding rational basis test applicable to due process challenge of statute imposing limits on liability resulting from operation of federally licensed nuclear power plants).

At common law, an innocent third party injured by a motorist fleeing from police had no right of recovery against the governmental entity employing the pursuing officer. The strict liability of a political subdivision in such circumstances did not exist until the enactment of the predecessor to § 13-911. See 1981 Neb. Laws, L.B. 273, § 31 (codified at Neb. Rev. Stat. § 25-21,183 (Cum. Supp. 1982)). The Legislature is free to create and abolish rights so long as no vested right is disturbed. *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003); *Peterson v. Cisper*, 231 Neb. 450, 436 N.W.2d 533 (1989). No one has a vested right in any particular remedy. *Id.* For the reasons discussed previously, the Legislature had a rational basis for limiting the amount of damages recoverable in claims under the Political Subdivisions Tort Claims Act, and the damage cap does not deprive Staley of substantive due process.

## (c) Enjoyment of Property

Staley argues that the damage cap violates his rights under Neb. Const. article I, § 25, which provides in pertinent part: "There shall be no discrimination between citizens of the United

States in respect to the acquisition, ownership, possession, enjoyment or descent of property." This argument is based upon the premise, for which no authority is cited, that the "right to recover in tort is a property right." Brief for appellee on cross-appeal at 47. However, in rejecting a claim that damage caps constitute an unconstitutional taking of property under Neb. Const. art. I, § 21, this court has joined others in rejecting the argument that a cause of action and determination of damages are property. *Gourley v. Nebraska Methodist Health Sys., supra.* The damage cap at issue here does not violate Neb. Const. art. I, § 25.

(d) Special Legislation

Staley alleges that the damage cap specified in § 13-926 violates article I, § 16, of the Nebraska Constitution, which prohibits the passage of any law "making any irrevocable grant of special privileges or immunities," and article III, § 18, which provides: "The Legislature shall not pass local or special laws . . . . Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever . . . . In all other cases where a general law can be made applicable, no special law shall be enacted." Staley contends that "[t]here is a substantial difference between the small political subdivisions and state and big city tort feasors" and that to the extent it provides a benefit to the City, the damage cap constitutes special legislation. Brief for appellee on cross-appeal at 49.

A legislative act constitutes special legislation violative of the state Constitution if (1) it creates an arbitrary and unreasonable method of classification or (2) it creates a permanently closed class. *Gourley v. Nebraska Methodist Health Sys., supra*; *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000). The analysis under a special legislation inquiry focuses on the Legislature's purpose in creating the class and asks if there is a substantial difference of circumstances to suggest the expediency of diverse legislation. *Id.*

Here, there is neither an arbitrary or unreasonable method of classification nor a permanently closed class. The damage cap embodied in § 13-926 applies to all political subdivisions of the State of Nebraska, which together create a single class of tortfeasors to which the Legislature has chosen to apply uniform rules and procedures governing tort liability. See, *Campbell v.*

*City of Lincoln*, 195 Neb. 703, 240 N.W.2d 339 (1976); § 13-902. By limiting the tort liability exposure of all political subdivisions in exactly the same manner, the Legislature has enacted a general law which does not contravene the constitutional prohibition of special legislation.

## V. CONCLUSION

For the reasons discussed above, we conclude that the district court did not err in finding that Staley's injuries were proximately caused by the nonnegligent actions of an Omaha police officer, Sears, during the vehicular pursuit, triggering the City's strict liability under § 13-911(1). We further conclude that the court did not err in upholding the constitutionality of § 13-926(1) or in entering judgment in favor of Staley in the amount of $1 million. We therefore affirm the judgment of the district court.

AFFIRMED.

WRIGHT, J., not participating.