Walter Maclovi-Sierra, appellant, v.
City of Omaha, Nebraska, appellee.
___ N.W.2d ___

Filed March 27, 2015.    No. S-13-1139.

1. **Political Subdivisions Tort Claims Act: Appeal and Error.** In actions brought under the Political Subdivisions Tort Claims Act, an appellate court will not disturb the factual findings of the trial court unless they are clearly wrong.

2. **Political Subdivisions Tort Claims Act: Judgments: Appeal and Error.** In actions brought pursuant to the Political Subdivisions Tort Claims Act, when determining the sufficiency of the evidence to sustain the trial court's judgment, it must be considered in the light most favorable to the successful party; every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence.

3. **Judgments: Appeal and Error.** An appellate court reviews questions of law independently of the lower court's conclusion.

4. **Political Subdivisions Tort Claims Act: Police Officers and Sheriffs: Motor Vehicles: Strict Liability.** Neb. Rev. Stat. § 13-911 (Reissue 2007) creates strict liability on the part of a political subdivision when (1) a claimant suffers death, injury, or property damage; (2) such death, injury, or property damage is proximately caused by the actions of a law enforcement officer employed by the political subdivision during vehicular pursuit; and (3) the claimant is an innocent third party.

5. **Police Officers and Sheriffs: Motor Vehicles.** Whether law enforcement sought to apprehend a motorist is a mixed question of law and fact.

6. **Police Officers and Sheriffs: Motor Vehicles: Proximate Cause.** Whether an injury to an innocent third party is proximately caused by the action of a law enforcement officer during vehicular pursuit is a question of fact which must necessarily be determined on a case-by-case basis.

7. **Proximate Cause: Evidence.** The question of proximate cause, in the face of conflicting evidence, is ordinarily one for the trier of fact, and the court's determination will not be set aside unless clearly wrong.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Robert M. Knowles and Christina M. Knowles, of Knowles Law Firm, for appellant.

Thomas O. Mumgaard, Deputy Omaha City Attorney, for appellee.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

STEPHAN, J.

Walter Maclovi-Sierra brought this action against the City of Omaha under the Political Subdivisions Tort Claims Act (the Act),[1] seeking damages for injuries he sustained when he was struck by a stolen vehicle allegedly being pursued by Omaha police officers. Following a bench trial, the district court for Douglas County dismissed the action after finding that any pursuit had terminated prior to the accident and that the actions of the officers did not proximately cause the accident and resulting injuries. Maclovi-Sierra perfected this timely appeal, which we moved to our docket on our own motion pursuant to our authority to regulate the caseloads of the appellate courts of this state.[2] The issues presented on appeal are primarily factual. Because we conclude that the factual findings of the district court are not clearly erroneous, we affirm its judgment.

## I. BACKGROUND

This action was brought pursuant to a section of the Act which provides in part: "In case of death, injury, or property damage to any innocent third party proximately caused by the action of a law enforcement officer employed by a political subdivision during vehicular pursuit, damages shall be paid to such third party by the political subdivision employing the officer."[3] Maclovi-Sierra contends that at all relevant times, the stolen vehicle that struck him was being pursued by Omaha police officers.

### 1. EVIDENCE

On January 14, 2011, at approximately 11:05 a.m., Maclovi-Sierra was standing on the south side of Q Street near the southbound entrance ramp to Highway 75 in Omaha, Nebraska. He was struck by a stolen vehicle operated by Gino Main and sustained permanent injuries.

---

[1] Neb. Rev. Stat. §§ 13-901 to 13-928 (Reissue 2007 & Cum. Supp. 2010).

[2] See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

[3] § 13-911(1).

Earlier that morning, Monica Anderson, an off-duty Sarpy County deputy sheriff, learned from her father that his blue Chevrolet Silverado pickup had been stolen from the driveway of his home near 28th and Washington Streets. At approximately 10 a.m., Anderson and her husband set out in their personal vehicle to try to find the stolen pickup.

They first drove around downtown Omaha and then went to South Omaha. At approximately 10:30 a.m., they spotted the pickup traveling southbound on 24th Street. Anderson called the 911 emergency dispatch service and told her husband, who was operating their vehicle, to follow the pickup. Anderson saw that the pickup was being driven by a man subsequently identified as Main. The pickup turned right on J Street and parked near a medical facility between 26th and 27th Streets. Anderson and her husband parked nearby, and she reported its location to the dispatcher. Over the next 5 to 10 minutes, Anderson observed Main sitting in the parked pickup while a passenger went in and out of the medical facility two or three times.

Anderson and her husband followed as the pickup left its parked location and proceeded west on J Street and then north on 27th Street. She testified that the pickup was traveling at a normal rate of speed at that time. As the northbound pickup approached the intersection of 27th and H Streets, Anderson saw an Omaha police cruiser driving south on 27th Street. The cruiser was operated by Omaha police officer Mark Cupak, who was alone in the cruiser.

While on patrol that morning, Cupak was dispatched to the area of 27th and J Streets where a stolen pickup had been spotted. Cupak proceeded south on 27th Street with his cruiser's flashing, rotating lights activated, but not his siren. Just before he reached the intersection of 27th and H Streets, Cupak saw the northbound pickup approaching his cruiser from approximately 1 to 1½ blocks away. At that location, 27th Street was a two-lane street in a primarily residential area with a speed limit of 25 miles per hour. When Cupak first observed the stolen pickup, it was being operated at a normal rate of speed, and if the pickup had not been reported stolen, it would not have drawn Cupak's attention.

Cupak attempted to stop the pickup at the intersection of 27th and H Streets by turning his southbound cruiser into the northbound lane of 27th Street and stopping with his cruiser's lights activated. Cupak remained inside his cruiser, and he drew his sidearm and pointed it at the approaching northbound pickup, hoping to block the pickup from proceeding north. But, in Cupak's words, the pickup "just went into the southbound lane, and . . . just nonchalantly just drove around my cruiser and kept going northbound" toward F Street. Cupak explained that the pickup "didn't accelerate, didn't go up over the curb to get around me. It was just — he just maintained his speed, and it was just like a Sunday drive, just drifted around me and continued north."

At that point, Cupak told his dispatcher what had occurred, put away his sidearm, and turned his cruiser around. This took several seconds. He then proceeded northbound on 27th Street with his cruiser's lights flashing but did not activate his siren. At that point, he could not see the pickup. Cupak testified that he accelerated to between 35 and 40 miles per hour in an effort to catch up to the pickup, but never did. He explained that to "catch up" to a vehicle is different than to chase or pursue it in that there is no intent to stop the vehicle. He did not advise his dispatcher that he was in pursuit of the pickup.

As Cupak approached the intersection of 27th and F Streets, he saw another police cruiser westbound on F Street with its lights activated, so he assumed the stolen pickup had turned onto F Street. When he heard a radio report that the pickup had struck another vehicle at the Highway 75 ramp on F Street and left the scene, Cupak proceeded to that location and completed an accident report. In his report, Cupak described the stolen pickup as "fleeing an attempted traffic stop."

Anderson gave a somewhat different account of Cupak's encounter with the stolen pickup. She testified that when the northbound pickup approached Cupak's southbound cruiser near the intersection of 27th and H Streets, the driver of the pickup "gunned it" and "accelerated to a high rate of speed," which she estimated to be at 45 miles per hour. She said that

Cupak turned his cruiser around and followed the pickup at the same speed with its lights flashing. Anderson saw the pickup proceed north on 27th Street and then turn west on F Street, with two other police cruisers following.

Anderson and her husband drove to a point on 28th Street where they could observe traffic on Highway 75. From there, Anderson saw the pickup enter the southbound lanes of Highway 75 at a speed which she estimated to be 70 miles per hour, followed by two police cruisers with their lights activated traveling at the same speed. She lost sight of the vehicles as they approached J Street. Anderson told the police dispatcher that the cruisers were "'in pursuit'" of the pickup. Anderson and her husband then proceeded to the Q Street overpass on Highway 75, where they saw that the pickup had crashed.

The two cruisers which Anderson saw following the pickup on F Street were operated by Omaha police officer Makayla Stiles and Omaha police sergeant Timothy Brown, with Brown in the lead cruiser. Both were at a police assembly area approximately one-half mile from 27th and F Streets when they heard a police dispatch concerning a stolen vehicle at that location. Each proceeded to that intersection, traveling east on F Street. Brown arrived first, and Stiles arrived a few seconds later. As she approached the intersection, Stiles saw Brown's cruiser stopped at the intersection, facing west on F Street. Stiles then saw the stolen pickup turn left from 27th Street onto F Street in front of Brown's cruiser. Brown followed the pickup, and Stiles followed Brown. Both officers had activated the flashing lights on their cruisers, and both activated their sirens after several blocks.

Stiles' cruiser was equipped with a system which made a video and audio recording of events beginning at 11:02:46 a.m. when the pickup turned left onto F Street and proceeded west in front of Brown's westbound cruiser. The recording, which was received in evidence, depicts the subsequent events from Stiles' perspective as she followed Brown's cruiser and eventually came upon the scene of the accident on Q Street at the top of the Highway 75 southbound exit ramp. The recording shows an elapsed time of 1 minute 45 seconds from the

time the stolen pickup turned west onto F Street until Stiles arrived at the accident scene and stopped her cruiser.

The recording shows the stolen pickup turning west onto F Street without stopping at the stop sign. Brown's lights were activated, and Stiles activated hers approximately 4 seconds after the pickup turned onto F Street. After the pickup turned, Brown accelerated, but was several car lengths behind the pickup, and Stiles followed several car lengths behind Brown. A siren is not heard on the recording until 9 seconds after the pickup turns. The cruisers followed the stolen pickup for several blocks to the Highway 75 entrance ramp.

The posted speed limit on F Street was 30 miles per hour. The two officers' opinions differed on whether they exceeded this speed as they followed the stolen pickup west on F Street. George Lynch, an accident reconstruction expert retained by Maclovi-Sierra, testified that in his opinion, Brown's cruiser was traveling approximately 40 miles per hour for at least part of the time on F Street. Brown testified that while following the pickup on F Street with his cruiser's lights and siren activated, he intended to close the distance so that the driver would understand his intent to make a traffic stop.

The stolen pickup proceeded west on F Street for approximately 14 to 15 seconds before sideswiping a stopped vehicle while turning onto the southbound Highway 75 entrance ramp. The pickup accelerated down the ramp and merged onto Highway 75 approximately 11 to 12 seconds after sideswiping the vehicle. Brown and Stiles followed, entering the ramp at a speed of 20 miles per hour. Stiles maintained a fairly consistent distance behind Brown. Both cruisers accelerated and reached a maximum speed of 70 miles per hour just as Brown merged onto Highway 75. The posted speed limit was 55 miles per hour. Upon entering Highway 75, both cruisers reduced their speed to between 60 and 68 miles per hour as they proceeded south.

The recording established that 12 seconds after entering the Highway 75 entrance ramp, Brown radioed: "I'm not going to be in pursuit." Seven seconds later, he radioed that the suspect was going "southbound in the fast lane . . . just going

under the L Street" overpass. One second later, Brown turned off his cruiser's flashing lights and siren.

Brown testified that while he was still on the Highway 75 entrance ramp, he realized the pickup would not stop and made the decision not to pursue but that he nevertheless accelerated down the ramp because he wanted to keep the pickup in sight long enough to alert other officers to the speed and direction of travel. Brown testified that he did not consider himself to be in pursuit at any point, but did not say so on his radio earlier because he thought it was more important to first transmit the location and direction of the pickup. Brown lost sight of the pickup when it passed under the L Street overpass. Stiles was still on the entrance ramp when she lost sight of the stolen pickup as it reached the L Street overpass.

The video recording shows Brown's cruiser passing beneath the L Street overpass 10 seconds after shutting down his cruiser's lights and sirens and 11 seconds after the stolen pickup passed that point. Still southbound on Highway 75, Brown passed beneath the Q Street exit 27 to 28 seconds after turning off his lights and siren.

Stiles exited Highway 75 at Q Street, intending to go back to the sideswiped vehicle on F Street. She came upon an accident at the top of the ramp. The video recording shows Main running from the scene as Stiles is approaching the top of the ramp. A few seconds later, she came to a stop approximately 1 minute 45 seconds after the stolen pickup initially turned onto F Street and 1 minute after Brown deactivated his cruiser's lights and siren. Upon exiting her cruiser, Stiles learned that Maclovi-Sierra had been struck by the pickup driven by Main, which remained at the scene of the accident. Main fled on foot, but was later captured a short distance away.

Main testified by deposition during his incarceration for offenses related to this incident. He was 19 years old at the time of the accident. He admitted to stealing the pickup. Main testified that when he encountered Cupak's cruiser on 27th Street, Cupak exited the cruiser, drew his weapon, and ordered him to stop. Main said he stopped for a few seconds before driving around the cruiser and proceeding north, accelerating

up to 45 miles per hour as he did so. He then observed Cupak following him with his cruiser's flashing lights activated, but said Cupak was never able to catch up with him. Main testified that as he approached F Street, he saw two police cruisers at the intersection with flashing lights activated and thought they were waiting to chase him.

Main testified that as he proceeded west on F Street at speeds exceeding the speed limit, he observed the cruisers behind him with lights and sirens activated and thought they were chasing him. He decided to "get on the interstate and try to outrun them and then head over to Iowa" because he believed the police would not pursue him across the state line. Main entered Highway 75 at F Street and exited at Q Street. He testified that while southbound on Highway 75, he changed lanes several times and reached speeds of up to 110 miles per hour. Just south of the L Street overpass, he lost sight of the two cruisers behind him, but he still believed he was being pursued. He exited Highway 75 at Q Street, intending to reenter Highway 75 northbound en route to Iowa, but lost control of the pickup and struck Maclovi-Sierra before hitting a utility pole. Main testified that he could hear sirens when he got out of the pickup after the accident and believed he was still being pursued. Main testified that from the time he reached 27th and H Streets until the moment of the accident, he was actively trying to resist apprehension by Omaha police.

Main acknowledged that he had previously stolen two or three vehicles and attempted to elude police on one of these occasions. He believed that if he reached a speed in excess of 85 miles per hour, police were required to stop the pursuit. On the day in question, he was attempting to drive in excess of that speed so he would not be pursued. He estimated that he was traveling at a speed of 100 miles per hour at the time he reached the L Street overpass. Main admitted that when he exited Highway 75 at Q Street, he could no longer see any police cruisers behind him and that he thought exiting the highway might be a smart idea, because police did not know where he was. But he did not believe he had completely eluded police, because "you can't outrun a radio." Main explained

that based on his prior experience attempting to elude police, he thought there were usually multiple cruisers in the area, and that he felt he needed to keep fleeing whether or not he could actually see police cruisers pursuing him. But he said he intended to slow down to a normal speed as soon as he could no longer hear police sirens so as not to attract suspicion.

Lynch testified that the distance between the L Street overpass and the scene of the accident is one-half mile. He testified it took Main between 20.42 and 24.4 seconds to travel that distance, assuming Main was going between 80 to 110 miles per hour. Lynch agreed, based upon his review of the video recording, that Main's speed exceeded that of Brown from the time that both vehicles entered Highway 75.

After the incident, all three officers completed a "Chief's Report," which required them to place the incident in one of four categories. Cupak characterized his contact with Main as a "Refuse to Stop/Vehicle Fled/Non-pursuit." Initially, Stiles and Brown used the same characterization in their reports. But, Lt. Gregg Barrios, who was Brown's immediate supervisor, directed Brown to revise his report to characterize the incident as "Vehicle Chase (Pursuit)." He indicated that Stiles would be required to do the same. Brown and Stiles subsequently filed revised reports as directed.

Barrios testified that after reviewing the incident with his superior, Capt. Katherine Gonzalez, he believed that Brown and Stiles were engaged in a vehicular pursuit "at some point." He believed that the pursuit ended when Brown announced over his radio that he would not be in pursuit. Barrios did not believe that Cupak had ever engaged in a vehicular pursuit. Gonzalez testified that after reviewing the incident with Barrios, she made the decision that Brown and Stiles should report the incident as a pursuit. She explained:

> [I]f there is any reason to believe that the fleeing person may have thought they were being chased, then it's better for us to write down that it's a pursuit, rather, because oftentimes the pursuit review will actually kick the report back and say it, in fact, was a pursuit.

She noted that "we always try to err on the side of caution, so there is no negative connotation by putting a pursuit down."

The Omaha Police Department's policy regarding vehicular pursuits was received in evidence. The policy utilizes the same definition of "pursuit" found in § 13-911. According to the policy, the use of emergency lights and sirens "merely to gain the attention of a driver to pull over" is not an active attempt to apprehend.

The parties stipulated that at all relevant times, Maclovi-Sierra was an "innocent third party" within the meaning of § 13-911(1) and that he complied with the provisions of the Act with respect to providing notice of his tort claim and withdrawing it from consideration prior to filing suit. The parties further stipulated that the medical expenses incurred by Maclovi-Sierra were necessitated by the accident and were fair and reasonable and that he will experience future pain and suffering as a result of his injuries.

## 2. Findings of District Court

The district court made detailed factual findings regarding the evidence summarized above. The court determined that where Anderson's testimony regarding the events on F Street and Highway 75 differed from the video recording, the recording was "the most accurate record of events." The court noted that Main's statements about the incident were frequently contradicted by other witnesses and evidence, and it specifically determined that Main's testimony that he could still hear sirens at the time of the accident was contradicted by the video recording and Lynch's testimony. The court found that "Main did not see or hear cruisers after he went under the 'L' Street overpass."

Based upon its factual findings, the court determined that Cupak attempted to make a traffic stop but did not initiate a vehicular pursuit of Main. The court found that Cupak "made no attempt to overtake or catch up to Main and did not engage in any further observation of Main after he proceeded onto 'F' Street."

The court also determined that "Brown and Stiles did not engage in a pursuit as defined by the statute. Their actions are more consistent with those described by the Omaha Police Department's policy on pulling over a driver for a traffic

stop." The court reasoned that the existence of a "pursuit" within the meaning of the statute required the coexistence of two elements: "(1) an active attempt by a law enforcement officer operating a motor vehicle to apprehend one or more occupants of another motor vehicle, when (2) the driver of the fleeing vehicle is resisting apprehension." The court determined that although Main was resisting apprehension by Brown and Stiles, "there was no active attempt to apprehend him."

Finally, the court concluded that even if Brown and Stiles had been attempting to apprehend Main, "the officers' actions were not the proximate cause of the accident in which [Maclovi-Sierra] was injured."

## II. ASSIGNMENTS OF ERROR

Maclovi-Sierra assigns, restated and renumbered, that the district court erred in (1) finding that the actions of the city's police officers did not constitute a vehicular pursuit as defined by § 13-911(5), (2) finding that any pursuit was terminated prior to the accident, (3) finding that the actions of the police officers were not the proximate cause of Maclovi-Sierra's damages, and (4) misapplying the applicable law with respect to proximate cause.

## III. STANDARD OF REVIEW

[1] In actions brought under the Act, an appellate court will not disturb the factual findings of the trial court unless they are clearly wrong.[4]

[2] In actions brought pursuant to the Act, when determining the sufficiency of the evidence to sustain the trial court's judgment, it must be considered in the light most favorable to the successful party; every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence.[5]

---

[4] *Blaser v. County of Madison*, 285 Neb. 290, 826 N.W.2d 554 (2013); *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012).

[5] See, *Werner v. County of Platte, supra* note 4; *Richter v. City of Omaha*, 273 Neb. 281, 729 N.W.2d 67 (2007).

[3] An appellate court reviews questions of law independently of the lower court's conclusion.[6]

## IV. ANALYSIS

[4] Section 13-911 creates strict liability on the part of a political subdivision when (1) a claimant suffers death, injury, or property damage; (2) such death, injury, or property damage is proximately caused by the actions of a law enforcement officer employed by the political subdivision during vehicular pursuit; and (3) the claimant is an innocent third party.[7] In this case, there is no dispute regarding the first and third elements. The case turns on whether Maclovi-Sierra's injuries were proximately caused by a "vehicular pursuit" of the stolen pickup by Omaha police officers.

### 1. Vehicular Pursuit

#### (a) General Principles

[5] The Legislature defined the phrase "vehicular pursuit" as used in § 13-911 to mean

> an active attempt by a law enforcement officer operating a motor vehicle to apprehend one or more occupants of another motor vehicle, when the driver of the fleeing vehicle is or should be aware of such attempt and is resisting apprehension by maintaining or increasing his or her speed, ignoring the officer, or attempting to elude the officer while driving at speeds in excess of those reasonable and proper under the conditions.[8]

Whether law enforcement sought to apprehend a motorist is a mixed question of law and fact.[9] As the Nebraska Court of

---

[6] *Mutual of Omaha Bank v. Kassebaum*, 283 Neb. 952, 814 N.W.2d 731 (2012); *Tymar v. Two Men and a Truck*, 282 Neb. 692, 805 N.W.2d 648 (2011).

[7] *Staley v. City of Omaha*, 271 Neb. 543, 713 N.W.2d 457 (2006); *Stewart v. City of Omaha*, 242 Neb. 240, 494 N.W.2d 130 (1993), *disapproved on other grounds, Henery v. City of Omaha*, 263 Neb. 700, 641 N.W.2d 644 (2002).

[8] § 13-911(5).

[9] See *Werner v. County of Platte, supra* note 4.

Appeals has noted, vehicular pursuit as defined by § 13-911(5) "involves multiple elements and, thus, is a much more nuanced matter than simply deciding whether one vehicle is trying to 'catch up' to, or maintain sight of, another."[10]

### (b) Actions of Cupak

In concluding that Cupak was not in pursuit of the stolen pickup as it proceeded north on 27th Street from H Street to F Street, the district court obviously credited Cupak's version of the events over the testimony of Main and, to some extent, Anderson. As the trier of fact, it was entitled to do so. Cupak testified that when he turned his cruiser around after the pickup drove past him, he could no longer see the pickup and was not certain whether it stayed on 27th Street or turned onto an intersecting street. He did not advise the police dispatcher that he was in pursuit, which would have been required under department policy if he intended to initiate a pursuit. Cupak explained that he did not initiate a pursuit because he could no longer see the pickup and "had no idea where he was." Cupak testified that he was attempting to "catch up" to the pickup not with the intent of stopping it, but to be available in the event of a foot chase or other event.

These circumstances are similar in some respects to the first of two incidents which we reviewed in *Mid Century Ins. Co. v. City of Omaha*.[11] There, an officer followed a motorist who drove away after being questioned by an officer and hearing a dispatch that he was suspected of involvement in a hit-and-run accident. The officer returned to his vehicle and accelerated in the direction that the vehicle had gone but did not actually see the vehicle. The officer testified that he did not know whether the vehicle had proceeded in that direction or turned off. The officer never again saw the vehicle before it collided with another vehicle, causing personal injuries to the occupants of that vehicle. We concluded that the trial court

---

[10] *Perez v. City of Omaha*, 15 Neb. App. 502, 515, 731 N.W.2d 604, 613 (2007).

[11] *Mid Century Ins. Co. v. City of Omaha*, 242 Neb. 126, 494 N.W.2d 320 (1992).

was not clearly wrong in determining that the officer was not engaged in a pursuit within the meaning of § 13-911.

We reach the same conclusion with respect to Cupak's actions. Viewing the evidence in a light most favorable to the city, as our standard of review requires, there is evidence from which a trier of fact could reasonably conclude that Cupak made no active attempt to apprehend Main after the unsuccessful attempt to stop him at 27th and H Streets. The district court did not err in concluding that Cupak was not engaged in a vehicular pursuit within the meaning of § 13-911.

### (c) Actions of Brown and Stiles

The district court determined that Brown and Stiles "did not engage in a pursuit as defined by the statute" and that "[t]heir actions are more consistent with those described by the Omaha Police Department's policy on pulling over a driver for a traffic stop." But it also determined that even if the officers' actions could be regarded as an active attempt to apprehend Main, that attempt was terminated by the time Main passed under the L Street overpass on Highway 75.

Whether Brown and Stiles were engaged in a vehicular pursuit in their initial encounter with the pickup is a close question, as is evident from the testimony of Barrios and Gonzalez. For purposes of our analysis, we will assume without deciding that Brown and Stiles initiated a vehicular pursuit of Main when he turned left at 27th and F Streets and proceeded west. However, the record fully supports the district court's finding that any pursuit was terminated prior to the accident when Brown transmitted over his radio that he would not be in pursuit and turned off his cruiser's emergency lights and siren.

### 2. Proximate Cause

The district court found that the actions of Brown and Stiles "were not the proximate cause of the accident" in which Maclovi-Sierra was injured. Maclovi-Sierra argues that the court misapplied the law of proximate cause, because he was not required to prove that the conduct of the officers was *the* proximate cause, only that it was *a* proximate cause. His understanding of the applicable law is correct. In *Meyer*

*v. State*,[12] we held that a provision of the State Tort Claims Act which imposed strict liability for injuries to innocent third parties proximately caused by a law enforcement pursuit "require[d] that the actions of a law enforcement officer during a vehicular pursuit be merely a proximate cause of the damage, and not the sole proximate cause." We subsequently held in *Staley v. City of Omaha*[13] that the same principle applied to the similar language in § 13-911.

But we are not persuaded that the district court misapplied these principles. We understand the district court's findings to be that any causal connection between the actions of Brown and Stiles and the accident was broken when Brown announced that he was not in pursuit and deactivated his cruiser's emergency equipment, so that the subsequent actions of Main in driving the stolen pickup constituted the sole proximate cause of the accident. The court concluded that Main chose to "drive recklessly" at the Q Street exit ramp "not based upon any objective observations" of Brown and Stiles "but rather because of a prior experience in an unrelated high speed chase." The court further found that "Main's reckless driving in anticipation of the possibility that other officers may arrive was the proximate cause of [Maclovi-Sierra's] injuries."

In *Staley*, a trial court determined that a police pursuit was a proximate cause of a personal injury accident involving the pursued vehicle, notwithstanding the fact that the police had terminated the pursuit prior to the accident. We affirmed, reasoning:

> A law enforcement officer's decision and action to terminate a vehicular pursuit do not instantaneously eliminate the danger to innocent third parties contemplated in § 13-911. That danger continues until the motorist reasonably perceives that the pursuit has ended and has an opportunity to discontinue the hazardous, evasive driving behaviors contemplated in the statute.[14]

---

[12] *Meyer v. State*, 264 Neb. 545, 550, 650 N.W.2d 459, 463 (2002).

[13] *Staley v. City of Omaha,* supra note 7.

[14] *Id*. at 551, 713 N.W.2d at 467.

*Staley* involved a pursuit in a residential neighborhood during hours of darkness. Because the police cruiser's siren was not functioning, the pursued motorist had no audible signal that the pursuit had been terminated. A passenger in the pursued vehicle testified that she saw the cruiser's flashing lights approximately 30 seconds before the accident. The fleeing motorist testified that he was attempting to evade police prior to and at the time of the accident. We concluded that under the totality of the circumstances, we could not say that the fleeing motorist's belief that he was being pursued was unreasonable, and we therefore affirmed the determination of the trial court that the pursuit was a proximate cause of the accident.

[6] But as we also said in *Staley*, "whether an injury to an innocent third party is 'proximately caused by the action of a law enforcement officer . . . during vehicular pursuit' is a question of fact which must necessarily be determined on a case-by-case basis."[15] In this case, the trial court made different findings of fact and reached a different conclusion than the trial court in *Staley*. Based upon the video and Lynch's testimony, the court discredited Main's testimony that he could hear sirens when he exited Highway 75, and it made a specific finding that "Main could not see or hear any trailing cruisers after he passed the 'L' Street overpass" and that Main's "subsequent decisions were based upon his assumption, from a previous high speed chase, that the trailing officers had radioed his location and other cruisers in the area may respond." The court further found:

> If Brown and Stiles were at any point in pursuit as defined by the statute, that pursuit had terminated. Main recognized the termination as he could no longer see or hear Brown and Stiles and continued to drive recklessly in anticipation of the arrival of other law enforcement that may search for him. Main's reckless driving in anticipation of the possibility that other officers may arrive was the proximate cause of [Maclovi-Sierra's] injuries.

---

[15] *Id.*

The court found that after Main could no longer see or hear the cruisers that had been following him on Highway 75, he chose to exit the highway with the intent of crossing over and reentering the highway "heading the opposite direction at a normal pace to disguise his flight from potential additional responding officers."

The court found that "Main was aware, or should reasonably have realized, that he had outrun the original cruisers to the extent that they were no longer visible and that sirens were no longer audible." The court further found: "Assuming Main believed, for his first 14 seconds of travel on the ramp and onto Hwy 75, that the officers were or may pursue him; he certainly should have reasonably perceived that any pursuit from Brown and Stiles had ended."

[7] The question of proximate cause, in the face of conflicting evidence, is ordinarily one for the trier of fact, and the court's determination will not be set aside unless clearly wrong.[16] Here, the district court determined that Main's actions leading to the accident were not motivated by a police pursuit, but, rather, by an intent to evade other law enforcement personnel who might be looking for him but who were not then in actual pursuit. While we acknowledge that another trier of fact may have viewed the evidence differently, that is so of almost any factual determination made on the basis of conflicting evidence. Based upon our review of the record, we cannot say that the determination of the district court with respect to proximate cause was clearly wrong.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

HEAVICAN, C.J., participating on briefs.

---

[16] *Staley v. City of Omaha, supra* note 7; *Meyer v. State, supra* note 12.