IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

YOST V. VILLAGE OF NORTH LOUP

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DAVID AND KRISTINE YOST, APPELLANTS,

V.

VILLAGE OF NORTH LOUP, NEBRASKA, APPELLEE.

Filed November 29, 2016.    No. A-15-861.

Appeal from the District Court for Valley County: KARIN L. NOAKES, Judge. Affirmed.

Christopher P. Wickham, of Sennett, Duncan, Jenkins & Wickham, P.C., L.L.O., for appellants.

Heather L. Sikyta, of Sikyta Law Office, for appellee.

Moore, Chief Judge, and RIEDMANN and BISHOP, Judges.

Moore, Chief Judge.

## I. INTRODUCTION

David and Kristine Yost appeal from orders of the district court for Valley County in favor of the Village of North Loup, Nebraska. The matter arose from flooding in the Yosts' basement. The court found the Yosts failed to prove the backup was sewage or that the Village was responsible; denied the Yosts' claims of negligence, res ipsa loquitur, and inverse condemnation; and overruled the Yosts' motion for new trial. Because we find no error, we affirm.

## II. BACKGROUND

### 1. BASEMENT FLOODING AND RESULTING DAMAGE

On May 30, 2007, the Yosts discovered water in the basement of their residence in North Loup. Upon inspection, David found a layer of ankle-deep water covering the basement floor.

- 1 -

David described the backup as "sewer water" which "stunk" and was "dark," "brown," "murky," and "discolored," stating further that "it looked like sewer water and it smelled like sewer water." David confirmed the presence of debris on the floor after the water receded, having the appearance of "leftover from toilet run over."

David contacted James Goodrich, Village Board Chairman, shortly following his discovery, informing him that sewer water was infiltrating his basement. Goodrich confirmed receiving this message regarding the flooding, but did not visit the Yosts' property, feeling that there was nothing he could accomplish by doing so. David also contacted Tom Essman, a Village board member, to report the issue. Essman also did not visit the basement following the incident. Carrie Hansen, Clerk of the Village of North Loup, did not recall anyone from the Village visiting the residence, but believed they were not asked to do so. David clarified at trial that he did not specifically request that anyone affiliated with the Village visit the residence, but he "just figured somebody probably would" visit the residence based on his report.

David rented and set up a gas-operated transfer pump in the basement during the morning of May 30, with the assistance of Bud Carlson, a Village resident, and started pumping water out of the house. David encountered difficulties with the gas-operated pump and consequently was required to rent an electric-powered pump. When he reinitiated pumping using the electric pump, David observed the water to be 10 to 12 inches deep in the basement. David identified the source of the backup as the laundry room floor drain. David observed water boiling out of this drain at a height of two feet. Once this was plugged, the water began boiling out of the basement toilet at a height of two feet, which was subsequently sealed. David testified that once the floor drain, toilet, and basement sink were all plugged, it took from Wednesday to Saturday or Sunday to pump all the water out of the residence.

A restoration company arrived at the residence one week after the backup was discovered and removed all the furniture out of the basement. They also cut four feet of drywall out of the basement bedroom addition and tore down the entire wall of paneling in the older area of the basement. The flooding also damaged personal property in the basement. At the direction of the restoration company, the Yosts discarded most of the damaged property to avoid any contamination from contact with the water.

## 2. COMPLAINT

On April 27, 2009, the Yosts filed suit against the Village of North Loup pursuant to the Political Subdivisions Tort Claims Act. The Yosts brought the following causes of action against the Village which are applicable to this appeal: negligence, res ipsa loquitur, and inverse condemnation. The Yosts requested special damages in the amount of $150,000 plus reasonable compensation for general damages incurred. The Village filed an answer containing a general denial of the allegations.

## 3. TRIAL

On June 22 and 23, 2015, trial was held before the district court. In addition to the testimony of the Yosts describing the backup and the resulting damage as set forth above, they also offered into evidence photographs of the damage to their basement, an estimate of their personal property

loss, summary of expenses, and numerous invoices and receipts from various service providers and retailers.

### (a) Potential Causes of Incident

Evidence was presented at trial addressing potential causes of the incident, including an inadequate sewer system or excessive groundwater from heavy rain.

### (i) Adequacy of Sewer System

Richard Snyder, a licensed civil engineer, testified as an expert witness for the Yosts. Snyder completed an engineering report on the Village's sewer system. Snyder testified that the Village's sewage retention lagoons were grossly inadequate in size. Snyder also noted that the "overflow control box" had been abandoned. The purpose of this box was to prevent water from flowing over the banks of the lagoon. However, Snyder observed that a pump, along with a propane tank, tractor, and pipes leading away from the lagoon site, had been installed for the purpose of discharging the lagoon into a nearby farm field. Snyder testified that this system, which appeared to be permanent in nature, was put in place to counter the "grossly undersized" lagoon system.

Snyder's report concluded that the brunt of responsibility for the flooding of Yost's basement fell directly upon the Village, and that the operation of the "municipal wastewater treatment plant" (i.e., sewage lagoon) can "most certainly be classified as negligent and haphazard." However, Snyder agreed on cross-examination that the Village's lagoon would have overflowed its banks prior to backing up into the Yosts' basement based on their comparative elevation. The floor of the basement was measured to be five feet higher than the top of the lagoon. Snyder assumed the cause of the backup was tree roots clogging the sewer line near the Yosts' residence. However, Snyder did not inspect the line to identify if roots were present.

Reed Miller, also a licensed civil engineer, testified as an expert witness for the Village. Reed similarly testified that the sewage lagoons needed to be at least twice as big to satisfy current size requirements. However, Miller testified that the size of the lagoon system would only affect treatment, not the flow of water through pipes. Specifically, Miller indicated that deficiencies at the lagoon site would not cause a backup similar to that described by David. Miller also stated that an operational overflow control box is not necessary for the lagoons to work properly.

Miller testified that based on the Yosts' basement floor's higher elevation, a lagoon backup could not have been the cause of flooding. Miller confirmed that the lagoon would flow over its banks before backing up into the sewer lines. Rather, Miller opined that a blockage in the sewer line would have to exist for a sewer backup to occur in the Yosts' basement. Miller testified to numerous ways such a backup could occur, including roots, pipe capacity being taken up by citizens using sump pumps, an intermittent clog, a flushed diaper, rainwater, or some combination of these factors. Miller was unaware of any way the Village could know that such a problem was present until a backup occurred.

Miller also noted that the backup could have specifically resulted from a problem with the service line between the Village's main sewer line and the Yosts' residence. Although the addition to the Yosts' basement and plumbing was relatively new, having been installed around 2004, Miller indicated that it is possible for new service lines to plug. Testimony received at trial

reflected that the resident is responsible for issues with the service line while the municipality is responsible for the main line, as established by ordinance.

Miller testified that if there was a clog in the Village main sewer line to which the Yosts' service line attached, it would be anticipated that every home on the same main line located behind the clog, or with a basement of similar elevation, would have a backup. However, Miller testified that of the three backups reported to the Village that same day, none were on the same main line as the Yosts. Snyder in turn noted at least six homes reporting a backup, but the record is unclear where these residences were located.

(ii) <i>Excessive Groundwater</i>

Excessive groundwater from heavy rain was also examined as a potential cause of flooding during the period at issue. Various testimony reflected that excessive groundwater could cause basement flooding either through overloading the sewer system and/or seeping directly into the basement.

The rainfall records for the Village indicate that 8.2 inches of rain fell during May 2007. Of this amount, 6.81 inches fell between May 22 and May 30, with 3.85 inches falling on May 30 alone. In response, the Village conducted emergency discharge pumping of the lagoon to counter the heavy rainfall, following communication between Hansen and an engineer with the Nebraska Department of Environmental Quality. The engineer noted that Hansen reported water one foot below the manholes in the Village, the lagoon was filling up, and she was receiving calls "about sewage in peoples (sic) basements."

James Heyen, formerly employed by the Nebraska Rural Water Association, submitted a letter to the Village addressing the rainfall issue. Heyen specified that increased wastewater flow around the date of the incident was the result of "rising groundwater, causing seepage into the sewer system for a long period of time" along with "one customer pumping groundwater from their basement into the village's sewer system." Heyen concluded the letter by opining that "a large amount rainfall fell (sic) in a short period of time, would cause the sewer system to be hydraulically overloaded for several days or longer."

A claim pertaining to the flooding of the Yosts' basement was denied by the Village's insurance company due to the amount of rainfall occurring that May. The denial letter from the insurance company described the amount of rainfall as "excessive" and a "rare occurrence in Nebraska."

Both Snyder and Miller testified that an influx of groundwater, surface water, or rainwater could have caused the sewer main line to fill up and overload. Miller further testified that for water to be spouting out of David's basement toilet, the sewer main "would have to be pressurized and totally full" as a result of a clog combined with continual water flow into the sewer. Miller testified that if the pumping took longer than half a day with all sewer access points plugged, as was the case with the Yost's basement, then "[m]ore water had to be coming in." Miller confirmed such other source as possibly groundwater seeping in through the walls. Miller indicated that there is no way to know exactly what caused the backup in question.

Testimony was received regarding the flooding which occurred in several other residences during the period at issue. Richard Myers, a Village employee, testified to assisting a neighbor

who lived across the street from the Yosts, whose basement contained 4 to 6 inches of water. According to Myers, the water had the appearance of groundwater, and was seeping through the basement walls and bubbling through the basement floor. Jerry Marshall, another Village employee, similarly recalled reports of water passing through floors and walls, as a result of the "high water table." Hansen noted that two other homes reported water coming in through a basement toilet. James Goodrich, a Village board member, testified to having groundwater enter his basement, reaching a depth of 4 inches. Carlson testified that his basement was flooded with groundwater during this time. As noted previously, Carlson indicated that the water in Yosts' basement was cloudy, but he did not recall it smelling. Carlson confirmed observing sewer water before, and knowing the difference between sewer water and groundwater.

(b) Available Preventative Measures

Testimony was also presented regarding methods available to municipalities to maintain an effective sewer system.

*(i) Flushing and Pumping of Sewer Mains*

Marshall testified that the Village tries to flush out the sewer mains each spring, but in actuality this occurs every two years. Hansen testified that the Village tries to flush the mains each spring and fall. Marshall has had to "snake" a particular sewer line to remove tree roots on several occasions. Marshall did not recall any issues with the sewer system around the Yost residence prior to May 30, 2007.

Marshall testified that the Village also pumps the sewer lines approximately two times per year, depending on the amount of rain. This was done more often in years with higher rainfall. Marshall confirmed doing such pumping of the water mains out of manholes following the heavy rainfall at issue.

*(ii) Smoke Testing*

A second method of evaluating sewer systems addressed at trial was "smoke testing." Snyder testified that smoke testing is utilized to locate any surface water entry points into a sewer system, such as cracks, which in turn could be removed. Goodrich did not recall the Village conducting smoke testing in its sewer system prior to the date of the incident, or that such testing was recommended.

Snyder testified that most communities similar in size to North Loup conduct such testing. To the contrary, Heyen, Johnson, and Miller all testified that most villages do not perform smoke testing unless there is a problem with the system. There is no requirement by the Nebraska Department of Environmental Quality to administer smoke testing on a regular basis.

Heyen conducted a smoke test of the Village's sewer system following the incident, in November 2007. This test identified several sewer "cleanouts" as a potential source of water infiltration. The results of the smoke test did not alter Heyen's conclusion that a substantial amount of rainwater/groundwater was the cause of the backup in May 2007.

## 4. ORDER

On July 28, 2015, the court entered judgment in favor of the Village. In reaching this decision, the court first made several factual findings, noting that each cause of action brought by the Yosts rested on the same factual claim; specifically, "that sewage entered the (Yosts') basement resulting in damage and that some action or inaction by the Village caused the damage."

The court found that the Yosts failed to prove by a preponderance of the evidence that the liquid in their basement was sewage or that the Village negligently caused the sewage. The court also found that the res ipsa loquitur claim failed. The court dismissed each cause of action and entered judgment in favor of the Village. The Yosts filed a motion for new trial, which was overruled.

The Yosts subsequently perfected this appeal.

## III. ASSIGNMENTS OF ERROR

The Yosts assign, restated, that the district court erred in (1) finding the Yosts failed to prove that it was sewage that backed up into their basement; (2) holding the Village was not responsible for the backup; (3) ruling in favor of the Village with respect to the Yosts' claims of negligence, res ipsa loquitur, and inverse condemnation; and (4) overruling the Yosts' motion for new trial.

## IV. STANDARD OF REVIEW

In actions brought under the Political Subdivisions Tort Claims Act, an appellate court will not disturb the factual findings of the trial court unless they are clearly wrong. *Maclovi-Sierra v. City of Omaha*, 290 Neb. 443, 860 N.W.2d 763 (2015). In actions brought pursuant to the Political Subdivisions Tort Claims Act, when determining the sufficiency of the evidence to sustain the trial court's judgment, it must be considered in the light most favorable to the successful party; every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Id.* An appellate court reviews questions of law independently of the lower court's conclusion. *Id.*

In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). An appellate court will not reevaluate the credibility of the witnesses or reweigh testimony but will review the evidence for clear error. *Id.*

An appellate court reviews a denial of a motion for new trial for an abuse of discretion. *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012).

## V. ANALYSIS

### 1. NATURE OF BACKUP

The Yosts argue that the district court erred in finding that they failed to prove that sewage, as opposed to groundwater, backed up into their basement.

In reaching the conclusion that the Yosts failed to prove that sewage, as opposed to groundwater, backed up into their basement, the district court noted that while David claimed the water smelled and was sewage, Carlson observed the backup as cloudy but not emitting a smell.

Additionally, the court considered the large amount of rainfall during the period at issue and evidence that other homes flooded, but that it was in the form of rainwater. The court also gave considerable weight to the testimony of Miller in reaching its determination that the backup was not in the nature of sewage, but was more probably in the nature of groundwater. The court specifically noted Miller's belief that the Yosts did not experience a sewage backup, because if that had been the case, Miller would expect other residences sharing the same main sewer line to have also experienced sewage backups, which was not reflected by the record. Additionally, the court considered that Miller, after reviewing the evidence, opined that if the backup was sewage, it should have only taken half a day to pump out rather than several days as attested to by David. This was more indicative of groundwater continuing to seep into the basement. The court further observed that the basement photographs did not support the Yosts' claim that the liquid was sewage rather than groundwater.

Upon our review, we find no clear error in the factual findings of the district court. Viewing the evidence in the light most favorable to the Village, there was sufficient evidence to sustain the district court's determination that the Yosts failed to prove that the nature of the backup in their basement was sewage. The trial court credited the evidence adduced by the Village in its finding. The trial court is the sole judge of witness credibility and testimonial weight, and this court will not reevaluate these factors in the absence of clear error. We find no clear error in the court's credibility determination. We also note that Snyder admitted that groundwater could have caused the backup in the Yosts' basement.

The Yosts' first assignment of error is without merit.

### 2. RESPONSIBILITY FOR BACKUP

The Yosts argue that the district court erred in finding that the Village was not responsible for the backup due to an inadequate sewer system, negligent operation of the sewer system, failure to regularly flush the system, and a failure to conduct smoke testing prior to the incident.

The district court based its finding that the Yosts failed to prove their basement flooding was caused by any action or inaction by the Village primarily upon its conclusion that Miller's testimony was more persuasive than that provided by Snyder. The court found no evidence to support Snyder's claim that the buildup of roots damaged the sewer system. Also, while the experts agreed that the lagoon system was deficient, the court found no evidence identifying this as the cause of the backup. Specifically, the court cited Miller's testimony that the lagoon would overflow before sewage could backup into the sewer lines.

Upon our review, we find no clear error in the district court's determination that the Yosts failed to prove the Village was responsible for the backup. The factual findings of the court were not clearly erroneous. Considered in the light most favorable to the Village, there was sufficient evidence to support a finding that actions or inactions by the Village did not cause the backup of water that occurred in the Yosts' basement. Nor do we find clear error in the district court's finding that Miller's testimony was more persuasive than that of Snyder.

In addition to the district court's findings above, we consider the testimony of Snyder which admitted that the inadequacies of the lagoon system did not cause the backup and that excessive groundwater could have been a cause of the backup.

Finally, evidence was presented regarding the Village's prior maintenance of the sewer lines, including its flushing, pumping, and snaking the lines. There was no evidence of prior problems with the sewer system that could cause the backup in the Yost residence, or prior knowledge by the Village of problems to put them on notice and require further inspection and testing. Although the Village did not conduct smoke testing prior to this incident, there was no requirement for the Village to do so and the subsequent smoke testing did not establish that the backup was caused by the Village as opposed to the substantial amount of rainfall and groundwater.

The Yosts' second assignment of error is without merit.

### 3. CAUSES OF ACTION AGAINST VILLAGE

The Yosts argue on appeal that the court erred in dismissing its claims of negligence, res ipsa loquitur, and inverse condemnation.

### (a) Negligence

A negligence action brought under the Political Subdivisions Tort Claims Act has the same elements as a negligence action against an individual. *Desel v. City of Wood River*, 259 Neb. 1040, 614 N.W.2d 313 (2000). In order to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty. *Deviney v. Union Pac. R.R. Co.*, 280 Neb. 450, 786 N.W.2d 902 (2010).

As set forth above, the district court found that the Yosts failed to prove that some action or inaction by the Village caused the damage, and we conclude that there was sufficient evidence to support this finding. Thus, the Yosts have failed in establishing the required element of causation, and accordingly, their negligence action must likewise fail. The district court did not err in dismissing this cause of action.

### (b) Res Ipsa Loquitur

The doctrine of res ipsa loquitur is an exception to the general rule that negligence cannot be presumed. Res ipsa loquitur is a procedural tool that, if applicable, allows an inference of a defendant's negligence to be submitted to the fact finder, where it may be accepted or rejected. *McLaughlin Freight Lines v. Gentrup*, 281 Neb. 725, 798 N.W.2d 386 (2011). There are three elements that must be met for res ipsa loquitur to apply: (1) The occurrence must be one which would not, in the ordinary course of things, happen in the absence of negligence; (2) the instrumentality which produces the occurrence must be under the exclusive control and management of the alleged wrongdoer; and (3) there must be an absence of explanation by the alleged wrongdoer. *Id*.

The district court held that the res ipsa loquitur claim failed "because water filling a basement is not the type of incident that normally happens as the result of the negligence of the Village." In support thereof, the court noted that the evidence showed many things which could have caused the basement to flood, and the most likely cause was "the extraordinary amount of rain the area had received."

Upon our review, we find that the district court did not err in dismissing the Yosts' res ipsa loquitur claim. Considering the factual findings of the court in a light most favorable to the Village, it is clear from our review that the elements of res ipsa loquitur are not satisfied in the present case. There was sufficient evidence demonstrating the existence of various potential explanations for the backup in the Yosts' basement, including the excessive rainfall, to preclude a finding that it could not have occurred in the absence of the Village's negligence.

(c) Inverse Condemnation

Inverse condemnation is a shorthand description for a landowner suit to recover just compensation for a governmental taking of the landowner's property without the benefit of condemnation proceedings. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). Inverse condemnation has been characterized as an action or eminent domain proceeding initiated by the property owner rather than the condemnor, and has been deemed to be available where private property has been actually taken for public use without formal condemnation proceedings and where it appears that there is no intention or willingness of the taker to bring such proceedings. *Id.* Because the governmental entity has the power of eminent domain, the property owner in an inverse condemnation cannot compel the return of the property taken; however, as a substitute, the property owner has a constitutional right to just compensation for what was taken. *Id.*

The threshold issue in an inverse condemnation case is to determine whether the property allegedly taken or damaged was taken or damaged as the result of the exercise of the governmental entity's exercise of its power of eminent domain; that is, was the taking or damaging for public use. *Id.* In order to meet the initial threshold in an inverse condemnation case that the property has been taken or damaged for public use, it must be shown that there was an invasion of property rights that was intended or was the foreseeable result of authorized governmental action. *Id.*

The Yosts argue that the alleged entry of sewage upon their property from sewer lines under the ownership and control of the Village was a public taking of private property, amounting to inverse condemnation.

The district court did not make a specific finding relative to the inverse condemnation claim. However, it did conclude that because the Yosts failed to prove by a preponderance of the evidence that the liquid in their basement was sewage or that the Village negligently caused the sewage to enter the basement, each cause of action was dismissed. Having concluded that the district court's findings in these regards were not clearly wrong, we find that the Yosts' inverse condemnation claim must fail. The evidence does not support a finding that sewage entered the Yosts' property as a result of the Village's control of the sewer lines or that their property was taken by the Village for public use.

We also note case law reflecting that a single instance of sewage backup is insufficient to constitute a taking. Rather, frequent flooding is required, which did not occur in this case. See *Henderson v. City of Columbus*, 285 Neb. 482, 494-495, 827 N.W.2d 486, 496 (2013) (flooding may be a compensable taking when it is frequent, which is consistent with the requirement for a taking or damaging of property to be a known or foreseeable result of government action for public use).

The Yosts' claim of inverse possession is without merit.

### 4. MOTION FOR NEW TRIAL

The Yosts argue that the district court erred in overruling their motion for new trial, on the basis that the judgment was contrary to the law and evidence presented at trial.

Having found sufficient evidence to support the district court's decision, it is clear that the court's judgment was not contrary to law or the evidence presented.

The Yosts' final assignment of error is without merit.

## VI. CONCLUSION

Upon our review, we find that the district court did not err in its dismissal of the causes of action brought by the Yosts against the Village of North Loup, nor in its denial of a motion for new trial. Accordingly, we affirm.

AFFIRMED.